COHEN, J.
Tommy Carlton appeals from the judgment and sentence entered after a jury found him guilty of solicitation to commit first-degree murder and attempted first-degree murder with a firearm. He argues the trial court erred in denying his motion for judgment of acquittal on the attempted first-degree murder charge because the State failed to establish that he committed an overt act towards the commission of the murder. We disagree and affirm.
Carlton first discussed murdering his ex-wife with James Wood, whom he met at a Narcotics Anonymous meeting. According to Wood, Carlton believed killing his ex-wife was the only way he could obtain custody of his son. Carlton proposed that he would kill the mother of Wood’s son, with whom Wood was having custody issues, in exchange for Wood killing Carlton’s ex-wife. Wood notified law enforcement about Carlton’s plan and cooperated with the Osceola County Sheriffs Office in an undercover operation in which a detective posed as a hit man recruited by Wood to murder Carlton’s ex-wife. Wood arranged a meeting among the three men, telling Carlton the detective was someone who could help with Carlton’s problem.
Carlton and Wood met the undercover detective in a hotel room to discuss hiring the detective to commit the murder. Officers conducted surveillance and recorded the conversation from a nearby room. A tape recording of the meeting was played for the jury at trial. In pertinent part, it revealed the following conversation:
[UNDERCOVER DETECTIVE]: ... Just tell me what you need done and I’ll decide how it’s gonna work.
[CARLTON]: What’s it gonna cost?
[UNDERCOVER DETECTIVE]: What do you want done?
[CARLTON]: Them taken out of the way so my son can come live with me. [UNDERCOVER DETECTIVE]: Them as in both?
[CARLTON]: Yeah. Well, I guess if she was out of the picture he would automatically be out of the picture, right? They’re not married.
MR. WOOD: They’re not married? [UNDERCOVER DETECTIVE]:
You’re the one who has to decide this for yourself, not me. I’m just here to do a business transaction.
[CARLTON]: Probably just her.
[[Image here]]
[UNDERCOVER DETECTIVE]: How do you want it done?
[CARLTON]: I don’t even want to know how it’s done.
[UNDERCOVER DETECTIVE]: How soon do you need it done?
[CARLTON]: Definitely before like the 14th.
[UNDERCOVER DETECTIVE]: It would take me a day or two of research, you know what I’m saying?
[CARLTON]: Uh-huh.
[UNDERCOVER DETECTIVE]: Figure out how I’m going to do it, when I’m gonna do it, and where I’m gonna do it.
[[Image here]]
[CARLTON]: I’m just like nervous saying exactly what I want done after we already talked and stuff, you know. I feel like I’m being set up.
[[Image here]]
[UNDERCOVER DETECTIVE]: You got a problem with putting the money up front?
[CARLTON]: Yeah. I’d have to do (inaudible).
[UNDERCOVER DETECTIVE]: No. I’m talking about putting money up front before I have to take her out.
*939 [CARLTON]: Yeah. I didn’t even prepare for that.
Ultimately, Carlton agreed to pay the undercover detective $1,500 total, with $500 as a down payment and the remainder to be paid over several weeks. Two days after the meeting, he gave the detective his ex-wife’s work address, home address, and photographs of her. He also agreed with the detective’s suggestion to establish an alibi by “mak[ing him]self visible somewhere” when the murder was to take place. The next day, Carlton met with the detective and gave him the $500 down payment. Carlton asked the detective to call him at the time of the murder so he could establish an alibi. A few hours later, the detective called and instructed him “to get [his] face on film like ASAP,” and Carlton went to his neighbor’s house to establish an alibi.
The following day, Carlton met with the undercover detective once more. When informed his ex-wife was dead, Carlton responded with the comments, “Thank God,” “Sweet,” and “Excellent.” The detective showed Carlton a photograph, purportedly of his murdered ex-wife. Later that day, Carlton was called to the Sheriffs Office where he was interviewed and arrested. At trial, the. lower court denied Carlton’s motion for judgment of acquittal on the attempted murder charge.
On appeal, Carlton argues the trial court erred in denying his motion for judgment of acquittal because the hiring of an undercover detective to kül his ex-wife and providing him with money, photographs, addresses and other information about the intended victim amounted to mere preparation rather than an overt act sufficient to establish attempted first-degree murder. Additionally, he asserts that no attempt was made on his ex-wife’s life because the person he hired to commit the murder was a police officer, and thus the murder was impossible to commit. This Court reviews the trial court’s denial of a motion for judgment of acquittal de novo. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002).
Under Florida law, criminal attempt occurs when a defendant commits “any act toward the commission of [an offense prohibited by law], but fails in the perpetration or is intercepted or prevented in the execution thereof....” § 777.04(1), Fla. Stat. (2009). To establish the crime of attempt, the State must prove the defendant intended to commit a crime, committed an overt act towards its commission, and failed to successfully complete the crime. See Bist v. State, 35 So.3d 936, 941 (Fla. 5th DCA 2010). The overt act element differentiates criminal attempt from solicitation, the latter of which is completed when a person asks another to commit a crime with the intent that the other commit the crime. See State v. Johnson, 561 So.2d 1321, 1323 (Fla. 4th DCA 1990); see also § 777.04(2), Fla. Stat. (2009). “An overt act is one that manifests the pursuance of a criminal intent, going beyond mere preparation to the actual commencement of the crime.” Bist, 35 So.3d at 941; see also Groneau v. State, 201 So.2d 599, 603 (Fla. 4th DCA 1967) (explaining for the overt act element to be established, “[t]here must be some appreciable fragment of the crime committed and it must be in such progress that it would be consummated unless interrupted by circumstances independent of the will of the attempter.”). “Drawing the distinction between a preparatory act and an overt act is often difficult and depends on the facts of each ease.” Bist, 35 So.3d at 941.
In murder-for-hire cases, differing viewpoints have evolved with respect to distinguishing acts of solicitation and mere preparation from the overt act element of *940 attempt. See generally Jeffrey F. Ghent, Annotation, What constitutes attempted murder, 54 A.L.R.3d 612 (1973).[1] We are aware of only one Florida case that addresses the overt act element of attempt in the murder-for-hire context. In Arias v. State, 593 So.2d 260, 263 (Fla. 3d DCA 1992), the Third District Court of Appeal reversed a conviction of attempted first-degree murder, finding the State failed to establish the overt act element of attempt. There, the- defendant, a nursing director, discussed with a coworker a plot to kill an infant born with severe birth defects. The coworker recommended another person commit the murder. When the three met to discuss the murder, the defendant supplied the would-be murderer with a fatal dose of pain medication to administer to the infant. No further action was taken, and the would-be murderer disclosed the plot to law enforcement. On review, the Third District held the defendant’s actions were only acts of preparation to commit murder rather than “overt acts nearing consummation of the crime.” Id. at 263. The court found that the plot to kill the infant went no further than discussing the murder and supplying the would-be murderer with the pain medication. Id. The court also noted that the discussion about the murder occurred four days before it was to take place, no action was taken after the defendant supplied the medication, and the would-be murderer testified she had not decided whether to help kill the infant. Id.
In support of its holding, the Third District cited Gervin v. State, 212 Tenn. 653, 371 S.W.2d 449, 454 (1963), in which the Tennessee Supreme Court determined an indictment alleging the defendant hired another to commit murder was insufficient to support a conviction of attempted murder. Discussing the concepts of solicitation and attempt generally, the Gervin court reasoned there are too many contingencies based on acts of solicitation alone, such as the willingness of the solicitant, to say “the dye [sic] is cast” and the plan to murder will be carried out. Id. at 451. The court explained that the contingencies remain until an overt act occurs. Id.; accord Hutchinson v. State, 315 So.2d 546, 548-49 (Fla. 2d DCA 1975) (citing Gervin *941 with approval and discussing distinction between solicitation and attempt).
Even if we agreed with the analysis in Arias, the instant case is distinguishable. Carlton initially approached Wood with the intent of securing the death of his ex-wife and hired the undercover detective to execute his plan. Then, over a five-day period, Carlton committed additional acts beyond hiring the detective: he provided photographs, addresses and information about the intended victim, made a down payment, and established an alibi. These further acts, coupled with the hiring of the detective, rose to the level of overt acts nearing consummation of the crime of first-degree murder. The uncertainties or contingencies present in Arias and explained in Gervin were absent in this case. Carlton took all the steps he was supposed to take to ensure his ex-wife would be murdered. Had Carlton not hired an undercover detective, he likely would have effectuated the murder of his ex-wife.[2] Accordingly, we affirm the trial court’s denial of Carlton’s motion for judgment of acquittal.
AFFIRMED.
PALMER and TORPY, JJ., concur.

. Courts nationwide differ in how they characterize the acts involved in hiring another to commit murder. Some courts view those acts as solicitation to commit murder rather than attempted murder, finding the hiring of a hit man a preparatory act instead of an overt act. These jurisdictions typically require an act be committed by the one solicited before finding the overt act element of attempt established in murder-for-hire cases. See, e.g., State v. Disanto, 688 N.W.2d 201, 208 (S.D.2004) (holding defendant's acts amounted to mere preparation as opposed to overt acts toward perpetration of murder where defendant hired hit man to murder ex-girlfriend and her boyfriend, gave hit man ex-girlfriend's address and photograph, provided details about valuables hit man could obtain from intended victims, and issued final instruction to proceed with murders). Conversely, other courts view the actions which constitute soliciting another to commit murder as being part of the overt act element of attempted murder. In these jurisdictions, the courts primarily concern themselves with whether the defendant’s actions were clearly intended to carry out the murder, and whether there was a reasonable certainty the murder would have taken place. See, e.g., People v. Superior Court, 41 Cal.4th 1, 58 Cal.Rptr.3d 421, 157 P.3d 1017, 1026 (2007) (finding overt act element of attempt satisfied where defendant hired hit man, supplied information about intended victim, and paid him down payment); State v. Kilgus, 128 N.H. 577, 519 A.2d 231, 236 (1986) (finding overt act element was met where defendant paid hit man $1,000, identified intended victim, and instructed hit man to dispose of corpse outside of state); State v. Group, 98 Ohio St.3d 248, 781 N.E.2d 980, 996 (2002) (finding acts of offering large monetary reward and reciprocal favor, as well as providing intended victim’s address and instructions on how to make bomb, constituted overt act towards commission of murder).

. We find Carlton's legal impossibility argu- • ment is without merit. See State v. Rios, 409 So.2d 241, 244 (Fla. 3d DCA 1982) ("The defense of legal impossibility has never been adopted in Florida in any criminal attempt prosecution and is generally discredited by toe overwhelming weight of authority in other jurisdictions. The more appropriate inquiry in criminal attempt prosecutions should focus ... on the defendant’s intent to commit a crime and any overt act done to effectuate this intent.” (citation omitted)).